**In re NORTEL NETWORKS CORP. SECURITIES LITIGATION**

**No. 01 Civ. 1855(RMB).**

United States District Court, S.D. New York.

Jan. 3, 2003.

Joshua M. Lifshitz, Peter D. Bull, Bull & Lifshitz, New York City, John Halebian, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, Steven Schulman, Milberg, Weiss, Bershad, Hynes, LLP, New York City, Mark Smilow, Weiss & Yourman, New York City, for plaintiffs.

Stuart Baskin, Sherman & Sterling, New York City, Mark Allen Strauss, Kirby, McInerney & Squire, New York City, Fred I. Isquith, Wolf, Haldenstein, Adler, Freeman & Hertz, New York City, Marvin L. Frank, Rabin & Peckel, LLP, New York City, Richard A. Speirs, Zwerling, Schacter & Zwerling, LLP, New York City, Marc I. Gross, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York City, Kenneth A. Elan, New York City, Jules Brody, Stull, Stull & Brody, New York City, Gary S. Graifman, Robert D. Wilkins, Kantrowiz, Goldhamer, & Graifman, New York City, Peter L. Masnik, Kalikman & Masnik, Haddonfield, NJ, Jeffrey Hermann, Cohn, Lifland, Perlman, Herman & Knopf, NJ, James P. Bonner, Salov, Stone & Bonner, New York City, Robert C. Susser, New York City, Brian Berry, CA, Andrew M. Schatz, Hartford, CT, Joseph Weiss, Weiss & Yourman, New York City, Roy J. Jacobs, New York City, Shaye Fuchs, NY, James Bashian, New York City, Laurence Rosen, New York City, Michael J. Kane, Mager, White & Goldenstein, LLP, Philadelphia, PA, for defendants.

### DECISION AND ORDER

BERMAN, District Judge.

## I. Introduction

This Decision and Order resolves Nortel Networks Corporation's ("Nortel" or "Company") motion(s) to dismiss, pursuant to Rules 12(b) and 9(a) of the Federal Rules of Civil Procedure, a series of purported class actions alleging violations of the federal securities laws, particularly Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The litigation was initiated following the precipitous decline in the value of Nortel's common stock on and after February 16, 2001.[1] In this (consolidated)

---

1. Soon after the drop in Nortel's stock, more than two dozen suits were filed against the Company in a number federal district courts.

action, purchasers of Nortel common stock and call options ("Nortel Plaintiffs") during the period October 24, 2000 through February 15, 2001 ("Class Period"), filed a Second Consolidated Amended Class Action Complaint ("Nortel Complaint" or "NC") against Nortel as well as John Andrew Roth, Nortel's Chief Executive Officer and President during the Class Period ("Roth"), Clarence Chandran, Nortel's Chief Operating Officer during the Class Period ("Chandran"), and Nortel's Chief Financial Officer during the Class Period, Frank Dunn ("Dunn"). (Roth, Chandran, and Dunn will be referred to as "Individual Defendants." The Individual Defendants, together with Nortel, collectively will be referred to as "Defendants.")

In a second purported class action, individuals who purchased the common stock of JDS Uniphase Corporation ("JDSU") during the period January 18, 2001 through February 15, 2001 ("JDSU Plaintiffs" and, collectively with the Nortel Plaintiffs, "Plaintiffs"), allege, as against Nortel and the Individual Defendants, violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5 ("JDSU Complaint" or "JC").[2]

Defendants filed their Joint Motion to Dismiss the Nortel and JDSU Complaints on August 15, 2002 ("Def.Mem."). On September 15, 2002, Plaintiffs filed a Joint Memorandum of Law opposing Defendants' motion ("Pl.Mem."). On September 30, 2002, Defendants filed a Reply Memorandum ("Def.Reply"). The Court heard (very helpful) oral argument on December 11, 2002. **For the reasons set forth below, the Court grants Defendants' mo-tion to dismiss the JDSU Complaint and denies Defendants' motion to dismiss the Nortel Complaint.**

## II. Background

For the purposes of this motion, the allegations of the Nortel Complaint and the JDSU Complaint are taken as true. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998).

Defendant Nortel is a Canadian corporation and one of the world's largest suppliers of "networking solutions and other services that support the Internet and other public and private data, voice, and video networks using wireless and wireline technologies." NC ¶ 28. Nortel is among the leaders of the Internet and telecommunications industry, which, particularly from 1999 through early 2000, became "very hot" and experienced substantial and rapid growth. NC ¶ 44. During 2000, the Internet and telecommunications sectors began a severe contraction. NC ¶ 45. By the start of the Nortel Plaintiffs' Class Period in October 2000, several of Nortel's largest customers were reducing orders for Nortel products and indicating to Nortel salespeople that orders for 2001 would be (even) lower. NC ¶ 5.

On October 24, 2000, Nortel issued an allegedly false and misleading press release indicating that the Company had experienced "strong growth" for the quarter ending September 30, 2000, and that "[l]eading the growth again this quarter, revenues for our Optical Internet Solutions grew nearly 90% in the quarter compared to the same period last year," ("October 2000 Announcement").[3] NC ¶ 66. The

On October 16, 2002, those actions were consolidated here.

**2.** JDSU, headquartered in both Ontario, Canada, and San Jose, California, designs and manufactures products used in fiber-optic communications. As described *infra,* in Feb-ruary 2001 Nortel purchased one of JDSU's production facilities in exchange for Nortel stock. JC ¶ 5.

**3.** "Despite a substantial $7.3 billion in reported sales and an impressive 42% in reported revenue growth for the third quarter of 2000,

October 24 press release went on to say that "[b]ased on the momentum we have experienced during the first nine months and the strong order backlog, we continue to expect that our percentage growth in 2000 over 1999 will be in the low 40's" and that in 2001 Nortel's revenue and earnings per share would grow "in the 30 to 35 percent range." NC ¶¶ 67–68. The October 2000 Announcement also included "cautionary language," stating that "[c]ertain information included in this press release is forward-looking and is subject to important risks," and that "results or events predicted in these statements may differ materially from actual results or events." Nortel indicated that:

> Factors which could cause results or events to differ from current expectations include among other things: ... the impact of rapid technological and market change; ... general industry and market conditions and growth rates; international growth and global economics conditions, ... the uncertainties of the Internet; ... and the impact of increased provision of customer financing by Nortel Networks.

October 2000 Announcement; Attached as Exhibit C to Affidavit of Stuart J. Baskin, dated Aug. 15, 2002 ("Baskin Aff.").[4]

According to the Nortel Complaint, the results reported in the October 2000 Announcement were materially false and misleading. NC ¶ 76. Specifically, Plaintiffs allege that Nortel did not experience "strong growth" and did not have a "strong order backlog" during the third quarter of 2000, "but rather experienced a material decline in the demand for its products" and "suffered a steady deterioration of sales and revenues in its Enterprise Solutions Group, which historically has accounted for a significant portion of the Company's business." *Id.* Plaintiffs further allege that Defendants' "guidance for 2001 (30–35% revenue growth) would be nearly impossible to achieve in light of contracting Internet and telecommunications sectors and the fact that defendants planned to improperly sacrifice a substantial portion of Nortel's 2001 revenues by pulling those revenues into 2000." NC ¶ 77.

Plaintiffs allege that Nortel's third quarter results were also materially misstated in the Company's third quarter 2000 Form 10-Q, filed with the Securities and Exchange Commission ("SEC") on November 7, 2000 ("Third Quarter Form 10-Q"). NC ¶ 86. In order, allegedly, to "conceal and temper the impact of the negative market changes on Nortel's business, defendants engaged in a variety of practices which caused Nortel's financial results for the third quarter to be materially enhanced and misstated in violation of Generally Accepted Accounting Principles ('GAAP') and SEC reporting rules." *Id.* For example, Plaintiffs allege that the Third Quarter Form 10-Q overstated the Company's results improperly by recording and reporting revenues from shipments of products, even though Nortel "vendor financed" these shipments by extending credit on 100 percent of the sale price to its customers. NC ¶ 88. According to Plaintiffs, vendor financing allowed customers to make purchases that they could not otherwise have made. "Without the extension of credit and/or infusions of cash from Nortel, these companies would not have had the funds sufficient to make the purchases of Nortel products that they did, and, in many cases, were so cash-poor that

---

Nortel's third quarter financial results were below analysts' expectations." NC ¶ 71.

4. These comments were also included in Nortel press releases dated November 1, 2000 and December 14, 2000, discussed *infra*.

they were on the brink of insolvency at the time they purchased Nortel products." NC ¶ 55. Plaintiffs allege that by recognizing revenue from these transactions, Nortel violated GAAP and the Company's own internal revenue recognition guideline policies, presumably because Defendants knew that the customers were unable to pay for the products. NC ¶¶ 89–93.

Another practice that allegedly was used improperly to increase reported revenues, involved "pulling forward" revenue into the third and fourth quarters of 2000. NC ¶ 82. "According to former Nortel employees 'pulling forward' is the practice of recording and reporting revenues from the anticipated sales of products in *later* quarters in[ ] an *earlier* quarter," i.e., in this case, recognizing in 2000 revenue for anticipated sales in 2001 to 2003. *Id.* Plaintiffs also allege that Nortel improperly recognized revenue based on "letters of intent" rather than formal purchase orders.[5] NC ¶ 98.

Plaintiffs allege that by September 2000 major Nortel clients, such as Verizon, WorldCom and AT & T, were (significantly) scaling back their business with Nortel and indicating that orders in 2001 would also be significantly reduced. NC ¶ 83–85. Despite these dramatic business difficulties, Plaintiffs allege that on November 1, 2000, Nortel issued another materially false and misleading press release, reiterating its positive outlook for 2000 and 2001 ("November 2000 Announcement"). NC ¶ 119. The November 2000 Announcement quoted Roth as saying that Nortel

expected its "percentage growth in revenue and earnings per share from operations in 2000 over 1999 will be in the low 40's." *Id.* Roth further indicated that "[l]ooking forward to 2001, we continue to expect the overall market to grow in excess of 20 percent," and that Nortel expected "to grow significantly faster than the market, with expected growth in revenues and earnings per share from operations in the 30 to 35 percent range" for 2001. NC ¶ 120.

At Nortel's Annual Investor Conference on November 21, 2000, the Individual Defendants continued to offer positive, but allegedly false and misleading, reassurances regarding Nortel's prospects for the fourth quarter of 2000 and for 2001. NC ¶ 125. Roth reiterated that the Company's sales and profits from operations (excluding costs of acquisitions) would grow 30 to 35 percent in 2001. *Id.* Dunn reaffirmed that Nortel expected to meet its revenue projections for the first quarter of 2001. Chandran described the demand for fiber-optics as "inevitable and unstoppable," and predicted 40 percent growth in the optical networking market. NC ¶ 126.

On December 14, 2000, Nortel issued another press release that was "virtually identical to the November 1, 2000 statement, again confirming their previously stated guidance for 2000 and 2001," ("December 2000 Announcement"). NC ¶ 136. Roth was quoted as saying that looking forward to 2001, the Company expected "to grow significantly faster than the market, with anticipated growth in revenues

---

5. Plaintiffs allege a number of ways in which Nortel improperly boosted revenue in the third and fourth quarters of 2000. "In general, Nortel: (i) improperly used 'vendor financing' to generate hundreds of millions of dollars of illusory revenues; (ii) engaged in a series of improper practices that caused Nortel to recognize hundreds of millions of dollars of revenue; (iii) failed to properly account for hundreds of millions of dollars of uncollectible receivables; and (iv) failed to timely and properly recognize approximately $12.5 billion in impairment losses in connection with four of Nortel's recent Internet and telecommunications acquisitions until the second quarter of 2001, after the end of the class period." NC ¶ 7.

and earnings per share from operations in the 30 to 35 percent range." NC ¶ 137. Plaintiffs allege that the statements contained in the December 2000 Announcement were materially false and misleading when made, in part because Nortel had experienced a decline in demand for the Company's products throughout the fourth quarter and because Defendants knew that Nortel's customers would reduce their orders in 2001. NC ¶ 141 ("defendants knew or recklessly disregarded that in light of significant market changes, Nortel's customers would continue to reduce their orders for Nortel products throughout 2001").

**Purchase of JDSU's Zurich Business**

By December 2000, the Company was engaged in talks with JDSU regarding Nortel's purchase of JDSU's Zurich, Switzerland pump laser business ("Zurich Business") for approximately $3 billion in Nortel stock. JC ¶ 7. JDSU's Zurich Business "was one of two facilities in the world that manufactured pump lasers, a key component of the most advanced fiber-optic networks." JC ¶ 192. Plaintiffs allege that the Zurich Business purchase was part of Nortel's strategy of acquiring other telecommunications companies using Nortel's "highly-priced shares as currency." NC ¶ 14. The JDSU Plaintiffs allege that during negotiations between Nortel and JDSU, Nortel provided JDSU with false and misleading information regarding the value of Nortel's stock. JC ¶ 132. On February 6, 2001, JDSU announced the sale of its Zurich Business to Nortel for $2.5 billion worth of Nortel common stock in addition to another $500 million in Nortel stock payable to JDSU if Nortel did not

meet certain purchase commitments.[6] JC ¶¶ 135–36.

Nortel issued another allegedly false and misleading press release on January 18, 2001, reporting the Company's results for the fourth quarter and full-year 2000 ("January 2001 Announcement"). Nortel reported that, for the fourth quarter, revenues increased 34 percent, while earnings per share from operations grew 24 percent. NC ¶ 152. Roth was quoted as saying that "the fourth quarter capped a year of exceptional growth, which was in line with our expectations." *Id.*

On February 15, 2001, nine days after the acquisition of JDSU's Zurich Business, Nortel allegedly reversed course and issued a press release dramatically lowering the Company's expectations for the first quarter and fiscal year 2001 ("February 2001 Announcement"). NC ¶ 165. The February 2001 Announcement "dramatically reduced the Company's guidance for 2001 growth in revenues and earnings per share from 30%, as stated less than one month earlier, to just 15% growth in revenues and 10% growth in earnings per share." NC ¶ 166. Nortel indicated that, among other things, the change was due to a "faster and more severe economic downturn in the United States" and longer than expected delays in spending by Nortel customers. NC ¶ 165. In a conference call with investors following the February 2001 Announcement, Roth said that the change in outlook was due, in part, to the fact that "[f]aced with limited access to capital, many telecommunications companies no longer are buying equipment in anticipation of new voice and data traffic." NC ¶ 168. "The press release also indicated

---

6. On February 8, 2001, Nortel Networks Limited, a wholly owned subsidiary of Nortel, completed an offering of $1.5 billion of 6.125 percent notes which mature on February 15, 2006. NC ¶ 188. Plaintiffs allege the "Defen-

dants were ... motivated to maintain Nortel's stock price at artificially inflated levels in order to receive favorable ratings from credit agencies prior to [the] $1.5 billion bond offering." *Id.*

that the Company would be laying off thousands of employees and that the scale back process had already begun." NC ¶ 165. On February 16, 2001, Nortel's stock price dropped almost 34 percent from its price the day before, i.e. from $29.75 to $19.00. NC ¶ 167. JDSU's stock dropped 21 percent that same day. JC ¶ 163. By November 2001, Nortel's quarterly revenue was down more than $3 billion from 2000 and Nortel had cut nearly 28,000 jobs. NC ¶ 174.

## III. Standard of Review

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669 (2d Cir.1995) (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)). "Common sense requires that courts remember the purpose of a pleading—to state a claim and provide adequate notice of that claim. A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *Gabriel Capital, L.P. v. Nat-West Finance, Inc.,* 122 F.Supp.2d 407, 411 (S.D.N.Y.2000). It has been said that "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Bower v. Weisman,* 639 F.Supp. 532, 539 (S.D.N.Y.1986) (citing *Arfons v. E.I.*

*du Pont De Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958)).

A Rule 10b–5 plaintiff must comply with Fed.R.Civ.P. 9(b) and plead fraud with particularity, so that defendants have "a reasonable opportunity to answer the complaint and . . . adequate information to frame a response." *Ryan v. Hunton & Williams,* 99 Civ. 5938(JG), 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) (quoting *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir.1979)). And, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (1997). "To state a claim under § 10(b) and the corresponding Rule 10b–5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000).

## IV. Analysis

Defendants seek to dismiss the JDSU Complaint on "standing" grounds. *See* Def. Mem. at 3. Defendants seek to dismiss the Nortel Complaint on the grounds that it (i) fails to allege a misstatement of material fact; and (ii) fails adequately to allege scienter.[7] *Id.* The

---

7. Defendants argue that because "plaintiffs have failed to plead either a primary violation of the Act by the individual defendants, or scienter, . . . the Section 20(a) [claim] must

therefore be dismissed." Def. Mem. at 21 n. 20. "Section 20(a) of the Exchange Act provides that '[e]very person who . . . controls any person liable [for a § 10(b) violation] . . .

JDSU Plaintiffs argue that they have standing based on the materiality of the Defendants' misleading statements about Nortel and the allegedly related decline in the JDSU stock price. Plaintiffs also argue that the Nortel Complaint adequately alleges "a stream of false reassurances and aggressive earnings guidance," NC ¶ 6, including the October 2000 Announcement, the Third Quarter Form 10–Q, the November 2000 Announcement, the December 2000 Announcement, the January 2001 Announcement, and the February 2001 Announcement. *See* Pl. Mem. at 6. The Nortel Plaintiffs allege that these misstatements were based, in part, on accounting violations designed to increase Nortel's reported revenue in the third and fourth quarter 2000. *Id.* Plaintiffs also contend that the Nortel Complaint sufficiently pleads scienter through allegations of (both) motive and opportunity and conscious misbehavior or recklessness. Pl. Mem. at 4.

### A. Standing of the JDSU Plaintiffs

■ Defendants persuasively point out that the JDSU Plaintiffs, who held JDSU stock during their class period, neither purchased nor sold Nortel shares and cannot bring a (private) claim under Rule 10b–5. Def. Mem. at 21. "Having neither bought nor sold Nortel securities of any kind, the JDSU plaintiffs seek money damages from Nortel on the ground that its statements about its own business performance and prospects adversely affected JDSU's stock price.... The JDSU plaintiffs' case is foreclosed by the Supreme Court decision of *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), as well as the seminal decision of the Second Circuit in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952)." Def. Mem. at 21. Plaintiffs respond that they are purchasers of securities (namely JDSU securities) as defined by *Blue Chip,* and, therefore, have standing. "Because each named JDSU Plaintiff and the JDSU Class bought JDSU stock during the class period ... the *Birnbaum* purchaser/seller rule is plainly satisfied." Pl. Mem. at 22.[8]

■ In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court adopted the *Birnbaum* rule that "the plaintiff class for purposes of a private damage action under s 10(b) and Rule 10b–5 [is] limited to actual purchasers and sellers of securities."[9] *Blue Chip,* 421 U.S. at 730, 95 S.Ct. 1917. The question in *Blue Chip* was "whether respondent may base its action on Rule 10b–5 of the Securities and Exchange Commission without having either bought or sold the securities described in the allegedly misleading prospectus." 421 U.S. at 727, 95 S.Ct. 1917. The Court found that the *Birnbaum* rule "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." 421 U.S. at 747, 95 S.Ct. 1917.

The JDSU Plaintiffs acquired JDSU shares during their class period. They did not purchase or sell the Nortel securities

---

shall also be liable jointly and severally with and to the same extent as such controlled person.' " *Ellison v. American Image Motor Co., Inc.,* 36 F.Supp.2d 628, 637 (S.D.N.Y. 1999) (citation omitted). The Court does not (here) dismiss the Nortel Plaintiffs' Section 10(b) claim and, therefore, their Section 20(a) claim also survives.

8. Plaintiffs argue that "they were injured when they purchased JDSU stock at prices that were artificially inflated by defendants' statements." Pl. Mem. at 22.

9. The *Birnbaum* rule refers to the holding of the United States Court of Appeals for the Second Circuit in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.1952).

"to which the prospectus, representation, or omission relates." *See also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 277, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring) ("in *Blue Chip* ... we confirmed the federal courts' 'longstanding acceptance' of the rule that a plaintiff must have actually purchased or sold the securities at issue in order to bring a Rule 10b–5 private damages action") (citations omitted); *Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir.2000) ("this Court ruled that no private action under those provisions is available to persons who were neither buyers nor sellers of the relevant securities") (citation omitted); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 485 (3d Cir.1998) ("[i]n *Birnbaum* the court ... concluded that Rule 10b–5 'extended protection only to the defrauded purchaser or seller' of the security at issue") (citations omitted); *Inter–County Resources, Inc. v. Medical Resources, Inc.*, 49 F.Supp.2d 682, 683 (S.D.N.Y.1999) ("plaintiff was concededly neither a purchaser nor a seller of the securities at issue in the claim, a basic requirement for standing to bring such a claim").[10]

Plaintiffs argue (unpersuasively in the Court's view) that the "stock at issue" in this case is JDSU stock. Tr. at 32 ("In our case the stock at issue is JDSU and by virtue of their purchases of JDSU, they plainly and simply satisfied the *Birnbaum* [/] *Blue Chip* doctrine.") "Because defendants' statements were material to JDSU investors, plaintiffs' purchases were in connection with those statements." Pl. Mem. at 23.

■ The United States Court of Appeals for the Second Circuit has "broadly construed the phrase 'in connection with,' holding that Congress, in using the phrase 'intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.'" *In re Carter–Wallace, Inc. Secs. Litig.*, 150 F.3d 153, 156 (2d Cir.1998) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (en banc)). Generally, the requisite connection exists "when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value." *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 966 (2d Cir.1993) (misrepresentations about Ames' business made in that company's reset note and debenture prospectus were issued "in connection with" plaintiffs' purchases of Ames common stock). That connection does not exist where, as here, the plaintiff does not allege that the defendant "misled him concerning the value of the securities he [actually bought or] sold or the consideration he received in return." *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 108 (2d Cir.1986); *see also Production Resource Group, LLC v. Stonebridge Ptns. Equity Fund*, 6 F.Supp.2d 236, 240 (S.D.N.Y.1998) ("the alleged misrepresentations made by defendants were not 'in connection with' the purchase or sale of securities, because they did not pertain to the value, nature or investment characteristics of the securities at issue.")

As Defendants point out, the JDSU Plaintiffs' allegations are the "essence of a

---

**10.** The JDSU Complaint revolves around alleged misrepresentations regarding Nortel securities which the JDSU Plaintiffs never purchased. *See, e.g.,* JC ¶ 10 ("Defendants perpetrated their fraudulent scheme by, among other false pronouncements, repeatedly informing investors that Nortel would see growth in revenue and earnings of 30% during 2001 and that they continued to see 'strong market demand' for Nortel's products.").

derivative claim." Def. Reply at 10 (citing *Burghart v. Landau,* 821 F.Supp. 173, 176 (S.D.N.Y.) *aff'd* 9 F.3d 1538 (2d Cir.1993)). And, while Plaintiffs may be correct that "JDSU may have its own cause of action for its purchase of Nortel shares at an inflated price," Pl. Mem. at 22, the JDSU Complaint is not brought by JDSU or derivatively on its behalf.

Plaintiffs fail to identify an analogous case (from this or another circuit) that allows, in the circumstances presented here, a shareholder of one company to bring a private Section 10(b) or Rule 10b–5 claim against a second company based on alleged misstatements pertaining to the second company's stock. Plaintiffs cite to *Ames,* discussed above, for the proposition that "it is not a bar to a 10b–5 action that the allegedly misleading statements pertain to a security other than the one purchased." Def. Mem. at 23. The instant ruling is consistent with *Ames.* In *Ames,* the court of appeals held that it was improper for the district court to dismiss a case where the plaintiffs were holders of common stock of the same issuer that allegedly made misrepresentations in connection with its reset note and debenture offering. *Id.* at 961. "[I]t is not a bar to a 10b–5 action that the false and misleading statements in a Registration Statement are pertaining to an issue of a security, be it preferred stock, reset note, or debenture, or otherwise, which is not the security purchased." *Id.* at 964. The *Ames* court did not find, as Plaintiffs contend, that misleading statements of one issuer are actionable by the holders of securities

of a different issuer upon the facts presented here.

The Plaintiffs also rely upon the decision of the United States Court of Appeals for the Third Circuit in *Semerenko v. Cendant Corp.,* 223 F.3d 165 (3d Cir.2000). The Court believes that such reliance does not enhance the JDSU Plaintiffs' cause. In *Semerenko,* a case involving competing tender offers, the Third Circuit did not, in fact, resolve the question of "whether the 'in connection with' test [was] satisfied," but ruled only that the district court applied the wrong standard. *Id.* at 177. In analyzing the standard of review employed by the district court, the court of appeals held that alleged misrepresentations by and about one company (Cendant) could be found to have been made "in connection with" the purchase of shares in a different company (ABI) where, among other things, Cendant made fraudulent misrepresentations concerning Cendant's financial condition, and about "its willingness to complete the tender offer, and its willingness to complete the proposed merger." *Id.* at 171.[11] Cendant shares may have been at issue because it was "possible that members of the Class would not have purchased shares of ABI common stock had they been unable to exchange them for shares of Cendant." *Id.* at 180. *Semerenko* does not stand for the proposition asserted by Plaintiffs here, i.e. that information regarding the financial condition of Nortel is "material" to the shareholder(s) of JDSU and is sufficient to give rise to the JDSU Plaintiffs' Section 10(b) and Rule 10b–5 claims.[12]

---

**11.** In *Semerenko,* Cendant was competing against AIG, Inc. to purchase the outstanding shares of ABI, eventually bidding the tender offer price up from $47 per share to a final price of $67 per share. *Id.* at 171. Cendant signed a merger agreement with ABI and made a number of public statements indicating that "it was committed to completing the

merger with ABI." *Id.* at 170. Cendant thereafter abandoned its tender offer plans; it terminated the merger agreement with ABI and agreed to pay ABI a $400 million break-up fee. *Id.* at 171.

**12.** Plaintiffs also cite to an unpublished opinion from the United States District Court for the District of Idaho, *Muzinich & Co. v. Ray-*

## B. Misstatements of Material Fact

Defendants argue that the Nortel Complaint, consisting of 209 paragraphs and 88 pages, fails to identify any (actionable) material misstatements made during the Class Period. Def. Mem. at 5. Defendants contend that the misstatements alleged fall into three categories: (i) factually accurate statements of historical fact, Def. Mem. at 7; (ii) expressions of "soft opinion" and "puffery", Def. Mem. at 7; and (iii) forward looking statements accompanied by suitable cautionary warnings. Def. Mem. at 9. Plaintiffs argue that the Nortel Complaint sufficiently alleges that Defendants' statements of both historical results and predictions of future financial performance were materially misleading. Pl. Mem. at 5. Plaintiffs also claim that some of Nortel's forward looking statements are actionable because they were not accompanied by sufficient cautionary language and Defendants did not have a reasonable basis for believing that Nortel's predictions were accurate. Pl. Mem. at 16.

### 1. Historical Statements

Plaintiffs allege that the historical results reported in Nortel's October 2000 and January 2001 Announcements and the Third Quarter Form 10–K were materially misstated, among other reasons, because of various "accounting irregularities perpetrated at Nortel." Pl. Mem. at 5. Plaintiffs contend that these irregularities included improper revenue recognition, failure to account for uncollectible receivables, and GAAP violations relating to the impairment of assets and caused Nortel's third quarter, fourth quarter and year-end 2000 results to be materially (over) enhanced and misleading. *See, e.g.,* NC ¶ 163 ("As in the 2000 third quarter, in order to conceal the impact of the significant contraction of the Internet and telecommunications markets on Nortel's business, defendants engaged in a number of accounting improprieties which caused the Company's results for the year-end 2000 (as reported by defendants on January 18 and 19, 2001) to be materially enhanced and misstated in violation of GAAP and SEC reporting rules.").

Defendants argue that because "Nortel's 2000 results were so stellar, and understandably provided the context for its own . . . expectations for 2001, plaintiffs have no choice but to plead that the results were not real." Def. Mem. at 11. That is, Defendants contend that Nortel's results for the third and fourth quarters of 2000 were not misstated and that Plaintiffs' allegation(s) of accounting improprieties must "fail as a matter of law." *Id.* Defendants argue that Plaintiffs have neither plead the alleged accounting improprieties with the requisite specificity, nor have the Plaintiffs adequately plead the materiality of the alleged misstatements. Def. Mem. at 12; *see also* Transcript of Dec. 11, 2002 Oral Argument ("Tr.") at 50 ("they plead all of these accounting standards which are the accounting standards and then if you look at it, your Honor, you will not find a single fact, other than Verizon, not a single particularized event other than Verizon, to try to apply those standards").

### a. Accounting Allegations are Adequately Specific

██ "The complaint must identify the statements plaintiff asserts were fraudu-

---

*theon Co.,* No. CV–01–284–S–BLW, slip op. at 2–3 (D.Idaho May 1, 2002), in support of the proposition that "statements issued about one company or its securities can, indeed, be 'in connection with' plaintiffs' purchases or sales of another security". Pl. Mem. at 25. In *Muzinich,* unlike the case at bar, it was alleged that the defendant "knew that these false financials would be included in WGI's Form 10–K filings with the [SEC], and that investors would rely on the Form 10–Ks." *Muzinich,* slip op. at 2.

lent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001). "A statement made in violation of GAAP may be found to be misleading or inaccurate under the federal securities laws." *SEC v. Caserta*, 75 F.Supp.2d 79, 90 (E.D.N.Y.1999); *see also In re Quintel Entertainment Inc. Secs. Litig.*, 72 F.Supp.2d 283, 293 (S.D.N.Y. 1999) ("Although 'allegations of a violation of GAAP provisions, without corresponding fraudulent intent are not sufficient to state a securities fraud claim,' if the Complaint alleges additional evidence of intent, a violation of GAAP may be the basis of a § 10(b) claim.") (citation omitted).

■ The Nortel Complaint alleges a number accounting practices that may have inflated improperly the Company's (reported) revenues during the third and fourth quarter of 2000 including: improper recognition of revenue from sales based upon letters of intent rather than formal purchase orders, NC ¶ 98; failure properly to reflect (through reserves or charges against income) the risk of "noncollectibility" of unsecured loans extended to uncreditworthy customers, NC ¶ 108; and failure to recognize "billions of dollars" in impairment losses on long-term assets obtained through the Company's acquisitions. NC ¶ 113.[13] The Nortel Complaint specifically alleges that the Company improperly reported revenue on sales where Nortel extended 100 percent vendor-financing to customers, with the knowledge that those customers could not pay for the product(s). NC ¶ 92. Plaintiffs contend that revenue from these sales were "known to be mate-

rially uncollectible" and that recording that revenue violated Nortel's "internal revenue recognition policies, which, according to Nortel's Form 10–K for the fiscal year ended December 31, 2000, required collection to be 'reasonably assured' prior to recognition." NC ¶ 93. Plaintiffs allege that this practice led to recording improperly "hundreds of millions, if not billions, of dollars" in revenue. NC ¶ 92. These allegations, if true, are more than a mere "contention that Nortel extended unwise loans." Def. Mem. at 12. They provide a (sufficiently) detailed account of "why, in plaintiff's view [the challenged statements] were fraudulent." *Scholastic*, 252 F.3d at 69. *See also Quintel Entertainment*, 72 F.Supp.2d at 293 ("These allegations sufficiently plead that the financial reports were false or misleading statements, subject to the requirements of materiality and scienter, discussed below.").

### b. Accounting Allegations are Material

■ Defendants contend that the alleged accounting improprieties are (individually) immaterial in light of Nortel's $30 billion in reported revenue for 2000. Def. Mem. at 12 ("In this case the [materiality] bar is high, as Nortel had $30 billion in 2000 revenue."). Plaintiffs respond that the alleged misstatements, taken as a whole, are "plainly material." Pl. Mem. at 20. "In Nortel's press releases, conference calls with analysts and periodic SEC filings, Nortel: (i) reported hundreds of millions, if not billions of dollars in false revenues (¶¶ 88–102); (ii) failed to timely and properly recognize $12.5 billion in impairment losses from certain of its acquisitions (¶¶ 113–18); and (iii) overstated the

---

**13.** Defendants do not appear to challenge a number of alleged GAAP violations, including improperly recognizing revenue where "Nortel shipped interim or substitute products and booked revenue as though the final products had been shipped," NC ¶ 100, and improperly recognizing revenue on the sale of new products prior to the expiration of the allowable date of return. NC ¶ 101.

Company's reported assets by failing to account for hundreds of millions, if not billions, of dollars in wholly uncollectible receivables (¶¶ 103–12)." *Id.* (emphasis excluded).

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 161. "The determination of materiality is a mixed question of law and fact that generally should be presented to a jury." *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999). A complaint should not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985); *see Ganino,* 228 F.3d at 162.

"[A]llegations of materiality should not be considered in isolation." *Manavazian v. Atec Group, Inc.,* 160 F.Supp.2d 468, 478 (E.D.N.Y.2001) Rather, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Ganino,* 228 F.3d at 162. Looking at all of the alleged accounting improprieties in the Nortel Complaint, the Court cannot conclude, as a matter of law, that they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman,* 754 F.2d at 1067; *see also In re Revlon, Inc. Secs. Litig.,* 99 Civ. 10192, 2001 WL 293820 at *9 (Mar. 27, 2001) ("A bill and hold transaction here, an improperly delayed customer credit there, 'and pretty soon you're talking about real money.'") (citation omitted).

## 2. "Soft–Opinion"

Defendants argue that Nortel's "statements of prediction, hope, opinion or belief about its own future performance are not actionable under Rule 10b–5." Def. Mem. at 7. Plaintiffs respond that the purported statements of "soft-opinion" are actionable because "defendants made specific and consistent misrepresentations, based on purported contemporaneous facts, regarding Nortel's expected revenues, earnings and earnings per share for fiscal year-end 2000 and fiscal 2001, and that each of those statements was made with defendants' actual knowledge or reckless disregard based upon adverse contrary facts." Pl. Mem. at 16–17 (citation omitted).

"Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b–5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them" *In re International Business Machines Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir.1998) (citations omitted). Here, Plaintiffs have alleged that Defendants did not genuinely or reasonably believe that the purportedly "soft" statements were true. The November 2000 Announcement, for example, quoted Roth as saying:

Looking forward to 2001, we continue to expect the overall market to grow in excess of 20 percent. Given our strong market position and leadership in high performance Internet solutions, we continue to expect to grow significantly faster than the market, with anticipated growth in revenues and earnings per share from operations in the 30 to 35 percent range.

NC ¶120.[14] The Nortel Complaint, however, explicitly alleges: that Defendants did not believe that the market would grow in excess of 20 percent; that the Internet and telecommunications markets experienced a significant contraction in the third quarter of 2000; and that it would be "nearly impossible" for Nortel to achieve 30 to 35 percent revenue growth in 2001, NC ¶123. *See Gabriel Capital,* 122 F.Supp.2d at 419 ("Thus, plaintiffs have alleged that SDI did not genuinely or reasonably believe that Mini–Mill was 'first class' when it made that statement.").

Several of Nortel's alleged misstatements were not simply "soft" predictions; rather, they contained recitations of (allegedly inaccurate) historical facts. In the October 2000 Announcement, for example, Roth stated: "Based on the momentum we have experienced during the first nine months and the strong order backlog, we continue to expect our percentage growth in 2000 over 1999 will be in the low 40's." NC ¶67. Plaintiffs have alleged that there, in fact, was no such momentum and that there was no such strong order backlog. NC ¶76. *See In re APAC Teleservice, Inc. Secs. Litig.,* No. 97 Civ. 9145(BSJ), 1999 WL 1052004 at *8 (S.D.N.Y. Nov.19, 1999) ("Linking future success to present and past performance does not render statements immune from liability.").

### 3. Bespeaks Caution and Safe Harbor

Defendants argue that Nortel's forward looking statements and expressions of opinion were accompanied by suitable cautionary warnings and, therefore, are not actionable under the bespeaks caution doctrine, and that they enjoy "safe-harbor" protection under the Private Securities

Litigation Reform Act ("PSLRA"). Def. Mem. at 9 ("Moreover, the guidance provided by Nortel to the investing public, as well as the expressions of opinion ... were all qualified with plentiful cautionary language."). Plaintiffs argue that Defendants' "generic warnings" were insufficient and failed to warn investors about the "undisclosed, adverse conditions" Defendants knew existed at the time they made the allegedly misleading statements. Def. Mem at 18–19 ("Defendants' generic warnings about potential negative economic trends 'beyond Nortel's control' did not alert investors to the undisclosed, adverse conditions then existing.").

"Under the bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." *In re Independent Energy Holdings PLC Secs. Litig.,* 154 F.Supp.2d 741, 755 (S.D.N.Y.2001). The cautionary language "must precisely address the substance of the specific statement or omission that is challenged." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996). "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 231 (S.D.N.Y.1999).

The warnings that accompanied Nortel's public statements, press releases and SEC filings failed adequately to warn investors about existing conditions described (alleged) in the Nortel Complaint. For example, Nortel's SEC Form 10–K for fiscal year 1999 (also referred to in Nortel's press releases during 2000), talks of

---

**14.** Defendants contend that this statement is nothing more than a prediction or hope for the future and is "not actionable as a matter of law." Def. Mem. at 8.

"intense competition in the telecommunications industry, the highly volatile nature of the technology sector, and ... 'factors beyond Nortel Networks' control [including] ... adverse changes in the specific markets for Nortel Networks' products; the conditions in the broader market for communications ... and the conditions in the domestic or global economy generally.' " Def. Mem. at 10 (citation omitted). Plaintiffs do not complain about Nortel's failure to disclose generic risks. Plaintiffs allege Nortel failed to disclose negative consequences from specific risks that had either already come to pass or were known to be imminent, i.e. that public statements were made with actual knowledge that they were false or misleading. *See, e.g.,* NC ¶ 77 ("defendants had been informed by major customers prior to the close of the 2000 third quarter that their orders in the fourth quarter and throughout 2001 would be significantly reduced"); *see also Prudential,* 930 F.Supp. at 72 ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").[15]

Under the safe-harbor provisions of the PSLRA, a statement regarding a forward looking statement generally does not give rise to a securities fraud claim if either: (i) it is accompanied by meaningful cautionary language, or (ii) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading. *See* 15 U.S.C. § 78u–5(c).; *see also Independent Energy,* 154

F.Supp.2d at 755. However, "it is well recognized that even when an allegedly false statement 'has both a forwardlooking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *APAC Teleservice,* 1999 WL 1052004 at *7 (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996)). As noted *supra,* many of the allegedly misleading statements identified in the Nortel Complaint included recitations of historical facts. *See In re Complete Management Inc. Securities Litigation,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001) (noting that safe-harbor provisions "apply to forward-looking statements only, and not to material omissions or misstatements of historical fact"). Because the Nortel Complaint alleges that the Defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions. *See Independent Energy,* 154 F.Supp.2d at 767.

## C. Scienter

Defendants argue that "plaintiffs have failed to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " Def. Mem. at 16 (quoting 15 U.S.C. § 78u–4(b)(2)). Plaintiffs respond that the Nortel Complaint alleges both "motive and opportunity" to commit fraud and "facts that constitute strong circumstantial evidence of defendants' conscious misbehavior or recklessness by establishing that they knew facts or recklessly dis-

---

**15.** With respect to vendor financing, "warnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* 99 Civ. 12046(WHP), 2001 WL 300733, *8 (S.D.N.Y. Mar. 28, 2001). *See* Def. Mem. at 12 n. 14 ("Should [vendor financing] customers fail to meet their obligations, losses could be incurred and such losses may have a material adverse effect on the business, results of operations, and financial condition of Nortel Networks").

regarded information contradicting their public statements." Pl. Mem. at 13.[16]

### 1. Motive and Opportunity

Defendants argue that "[f]ar from pleading motive and opportunity to commit fraud, the [Nortel] Complaint manages to negate any such motive." Def. Mem. at 17. Plaintiffs respond by saying: first, that because "Nortel's success was particularly and highly dependent upon making acquisitions to sustain its revenue and growth targets," the Company was "motivated" to maintain the market price of its shares, Pl. Mem. 11, and second, "Nortel could not have completed its February 8, 2001, $1.5 billion bond offering on the terms at which the bonds were sold had defendants first made truthful disclosures about Nortel's adverse financial condition." Pl. Mem. at 12.

Generally, motive "would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity, would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001).

 It is unclear that motive is shown here. *See Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) ("Finally, the com-plaint alleges that the defendants had a motive to artificially inflate Citizens' stock price during the class period in order to get more favorable terms in the stock-for-stock transactions and in the issuance of the debentures. This motive is also insufficient to establish scienter and is routinely rejected by the courts."); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances because '[i]f scienter could be pleaded on that basis alone', virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.") (citation omitted). At the same time, the desire to consummate corporate transactions may in some instances "be a motive for securities fraud." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir.2000). In any event, the Court need not reach the question of motive, because Plaintiffs have sufficiently plead that Defendants knew or recklessly disregarded that their public statements were misleading.

### 2. Conscious Misbehavior or Recklessness

Plaintiffs argue that they have pled scienter by alleging "facts that constitute strong circumstantial evidence of defendants' conscious misbehavior or recklessness." Pl. Mem. at 13. Plaintiffs point, among others, to allegations that "Nortel's

---

**16.** "Scienter is a necessary element of every 10b–5 action, and though it need not be plead with 'great specificity,' the facts alleged in the complaint must 'give[ ] rise to a "strong inference" of fraudulent intent.'" *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir.1993) (citations omitted). "A plaintiff can establish a strong inference of fraudulent intent in two ways: 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

problems were fundamental and should have been obvious to the Individual Defendants." Pl. Mem. at 13 citing NC ¶¶ 29–31. The Nortel Complaint alleges that the Defendants knew that many of the Company's largest customers were cancelling orders and were planning to reduce orders in the coming years. *See, e.g.,* NC ¶ 85. Defendants respond that Plaintiffs fail to establish that "the executives responsible for the company's securities disclosures" had knowledge that the alleged misstatements were false. Def. Mem. at 19.

"To survive dismissal under the 'conscious misbehavior' theory, the [Plaintiffs] must show that they alleged reckless conduct by the [Defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Carter–Wallace,* 220 F.3d at 39 (citation omitted). "The facts alleged to support recklessness must be 'strong circumstantial evidence' of that recklessness." *Chill,* 101 F.3d at 269 (quoting *Acito v. IMCERA Group,* 47 F.3d 47, 52 (2d Cir. 1995)) "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000).

Plaintiffs have adequately alleged that the Defendants either had actual knowledge of or ready access to facts that contradicted their public statements. "[P]rior to the close of the third quarter, Nortel senior management had been informed by ... major clients, including WorldCom and AT & T that orders in 2001 would be significantly reduced," NC ¶ 83; by the end of 2001, it was "common knowledge at Nortel ... that sales were headed for a 'serious decline.'" NC ¶ 143. Despite these negative developments, Plaintiffs allege that Defendants continued to issue positive statements regarding Nortel's outlook for of 2000 and 2001. The October 2000 Announcement stated that based on Nortel's "momentum" and "strong order backlog" the Company expected "percentage growth in 2000 over 1999 will be in the low 40's." NC ¶ 67. The Nortel Complaint alleges that this statement was made despite the fact that "defendants had been informed by major customers prior to the close of the 2000 third quarter that their orders in the fourth quarter and throughout 2001 would be significantly reduced." NC ¶ 77. In the January 2001 Announcement, Roth said that "[o]verall the fourth quarter capped a year of exceptional growth, which was in line with our expectations." NC ¶ 153. The Announcement went on to quote Dunn as saying that Nortel was "projecting growth in revenues and earnings per share from operations in 2001 over 2000 of 30 percent." The Nortel Complaint alleges that these statements were false. *See* NC ¶ 161 ("the financial results reported for the fourth quarter and full year-end 2000 were materially misstated and presented in violation of GAAP"). "Defendants knew that '30 percent' growth in revenues and earnings per share in 2001 would not be possible because ... throughout the fourth quarter 2000, they received budgets from numerous customers indicating that their 2001 orders would be substantially below that of 2000. Indeed, Verizon's optical purchases were projected to be less than 10% of the $1.1 billion reported in 2000, and AT & T, WorldCom and other major customers submitted budgets for 2001 that were 20%

lower than that of 2000." *Id.* Plaintiffs sufficiently allege "defendants' knowledge of facts or access to information contradicting their public statements." *Carter–Wallace*, 220 F.3d at 40 (quotation omitted); *see also* NC ¶ 85 ("Nortel management were regularly provided with Equipment Inventory Reports for WorldCom and other major Nortel customers"); NC ¶ 84 ("Based on conversations with his customers in September 2000 [the Vice President of Global Sales for Nortel's High Performance Optical Group] submitted to defendant Chandran his group's fourth quarter 2000 sales forecasts, which were significantly lower than previously expected."); ¶ 161 ("throughout the fourth quarter of 2000, they received budgets from numerous customers indicating that their 2001 orders would be substantially below that of 2000"); *Chill*, 101 F.3d at 269 ("An egregious refusal to see the obvious, or to investigate the doubtful, may … give rise to an inference of recklessness.") (internal citations and quotations omitted).

## V. Conclusion and Order

Defendants' motion to dismiss [61] is granted as to the JSDU Complaint [31] and denied as to the Nortel Complaint.

Counsel are requested to appear at a status/scheduling conference with the Court on January 29, 2003, at 3:00 p.m., in Courtroom 706 of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York. Any application to replead may be addressed at the conference. **The parties are directed to engage in good faith settlement negotiations prior to the conference with the Court.**