**In re NTL, INC. SECURITIES LITIGATION**

**This Document Relates to: All Cases**

**No. 02 Civ.3013 LAK.**

United States District Court, S.D. New York.

Dec. 6, 2004.

18

Jeffrey M. Haber, Felicia L. Stern, Bernstein Leibhard & Lifshitz, LLP, Daniel B. Scotti, Cary L. Talbot, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, for Lead Plaintiffs in No. 02 Civ. 3013.

Robert Hermann, Thacher Proffitt & Wood, LLP, New York City, for Plaintiffs in No. 02 Civ. 7377.

Brooks R. Burdette, David K. Momborquette, James J. O'Brien, Schulte Roth & Zabel, LLP, New York City, for Defendants George S. Blumenthal, J. Barclay Knapp, John F. Gregg, and Stephen Carter.

Joel W. Stemman, Julie Pechersky, Katten Muchin Zavis Rosenman, New York City, for Defendant George S. Blumenthal.

Seth M. Schwartz, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Defendant NTL Europe, Inc., formerly known as NTL Incorporated.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Following the collapse of the Internet and technology boom, courts have been faced with numerous actions against telecommunication and other technology companies whose stock prices declined precipitously. This controversy involves one such former telecommunications giant, NTL, Inc. ("NTL"), a New York based corporation that provides telephone, cable television, Internet and broadband communications services in the United Kingdom, Ireland and parts of continental Europe.[1]

In the late 1990s, NTL pursued an aggressive growth strategy, largely financed by substantial debt. Defendants allegedly knew that this debt threatened NTL's financial condition, but represented otherwise in their public statements. Moreover, plaintiffs claim that NTL and its directors defrauded investors by failing to disclose material problems that undermined NTL's financial stability. By April 2002, the stock price had decreased to less than one dollar, and the company filed for bankruptcy. These securities fraud suits followed.

### I. The Pleadings

#### A. The Class Complaint

Plaintiffs in No. 02 Civ. 3013 ("Class Plaintiffs") purportedly represent a class of purchasers of NTL common stock and debt securities between August 2000 and November 2001 ("Class Period"). They sue NTL[2] and four individual defendants[3]

---

1. Consolidated Amended Class Action Complaint ("Class Cpt.") ¶ 2.

2. NTL failed for Chapter 11 protection on May 8, 2002. Its plan of reorganization was confirmed by the bankruptcy court on September 5, 2002, and became effective on January 10, 2003. The successor entity is NTL Europe, Inc. The bankruptcy court ruled on May 23, 2003, that plaintiffs may pursue

claims against NTL to the extent of its available insurance coverage only. Mem. Decision, No. 02–41316(ALG) (Bankr.S.D.N.Y., May 23, 2003); *see also* Gordon Pl. Mem. 1 n. 1.

3. George S. Blumenthal was chairman and treasurer; J. Barclay Knapp was president and chief executive officer; John F. Gregg

under the Securities Exchange Act of 1934 (the "Exchange Act")[4] and Rule 10b–5 thereunder.[5]

The complaint alleges that NTL, beginning in 1993, pursued a strategy of growth through acquisition, acquiring eleven companies in 1998–2000.[6] The two largest of these acquisitions, Cable Wireless Communications ("ConsumerCo") and Cablecom, together cost over $16.5 billion. NTL issued debt securities to finance these acquisitions, resulting in debt of $15.1 billion by 2000.[7]

Throughout this period, NTL, like all public companies, communicated with the investing public through SEC filings, press releases and interviews. While some statements were purely factual, others expressed optimism about NTL's future or portrayed the company in a positive light. For example, defendant Knapp, the chief executive officer, commented in a July 18, 2001, press release, "[o]ur current operating results are very strong and we have always had great confidence in the future. In our upcoming presentation we will be describing how our increasingly strong performance will make our current funding sufficient for us to reach free cash flow positive by the end of 2003."[8] Nevertheless, NTL stock declined steadily throughout the Class Period from approximately $48 per share at the beginning to $1.60 per share on November 29, 2001.[9]

This for the most part is not a case involving outright falsehoods. Most of plaintiffs' allegations are to the effect that otherwise routine statements by NTL were materially misleading because defendants failed to disclose NTL's alleged internal problems in order to inflate NTL stock price. These alleged problems fall into two major categories, the allegations of which are premised entirely upon information and belief:[10] (1) difficulties in integrating acquired companies, and (2) problems with the customer base. In addition, plaintiffs in a few instances allege that defendants themselves made affirmative statements or are responsible for affirmative misstatements or material omissions made in third-party analyst reports.

Plaintiffs sue NTL and the individual defendants both as primary violators of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder and as control persons under Section 20(a) of the Exchange Act.[11] The individual defendants move to dismiss.

### B. The Gordon Complaint

Plaintiffs in No. 02 Civ. 7377 ("Gordon Plaintiffs") are individuals and a limited partnership that purchased or acquired NTL securities between January 12, 2000 and April 16, 2002 ("Applicable Period"). The defendants in the class action all are sued here as well save Stephen Carter.

The second amended complaint ("Gordon Complaint") adopts the Class Complaint in its entirety and adds a few allegations.[12] It complains of several additional

---

was chief financial officer; and Stephen Carter was chief operating officer during the Class Period. Class Cpt. ¶ 16.

4. 15 U.S.C. § 78a *et seq.*

5. 17 C.F.R. § 240.10b–5 (2004).

6. Class Cpt. ¶ 3.

7. *Id.* ¶ 5.

8. *Id.* ¶ 124.

9. *Id.* ¶¶ 70, 156.

10. *Id.* at preamble.

11. 15 U.S.C. § 78t(a).

12. Gordon Cpt. ¶ 50. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a

statements and makes additional allegations in support of its *scienter allegation*, the majority of which result from the personal relationship between Frederick Gordon and defendant Blumenthal.[13] For example, the Gordon Complaint alleges that defendants made additional misleading statements directly to Gordon.[14] It contains also additional allegations as to why statements were misleading.

The Gordon Plaintiffs sue NTL and the individual defendants as primary violators under Section 10(b) of the Exchange Act, Rule 10b-5, and 17 C.F.R. § 229.303, and for common law fraud. The individual defendants are sued also as control persons under Section 20(a). All defendants, including NTL, move to dismiss the second amended complaint.

## II. Standard Governing Motions to Dismiss

In deciding a Rule 12(b)(6) motion, the Court accepts as true all allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[15] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[16] Although such motions are addressed to the pleadings, a district court may consider also the full text of documents partially quoted in the complaint where the documents are "integral" to it and relied upon by plaintiffs.[17] Accordingly, review of the exhibits attached to defendants' moving papers is appropriate.[18]

As this is a securities fraud case, the complaints must meet also the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). These have three particularly relevant effects here. First, the complaints must state the circumstances constituting fraud with particularity.[19] They "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements

---

complaint to include ... any statements or documents incorporated in it by reference."). To the extent the two complaints overlap and the allegations in the Class Complaint are sufficient, the Court will not address those in the Gordon Complaint.

**13.** Gordon and Blumenthal allegedly were fraternity brothers in college and had both a friendship and a business relationship. Gordon Cpt. ¶ 27.

**14.** *See id.* ¶¶ 52, 74, 98, 103, 105, 112, 114, 117–19, 121–24, 136.

**15.** *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001), *cert. denied,* 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002) (citing *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994)).

**16.** *Cohen v. Koenig,* 25 F.3d 1168 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

**17.** *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808–09 (2d Cir.1996) (district court did not err in considering full text of press releases, wire service reports, newspaper articles, and annual company reports that were only partially quoted in complaint); *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 218 n. 6 (S.D.N.Y.1999) ("According to the emerging rule in this Circuit, 'a district court may consider the full text of a document partially quoted in the complaint where ... Plaintiffs have notice of the document's contents and the document is integral in drafting the complaint.' ") (alteration in original) (citations omitted); *see also Rothman,* 220 F.3d at 88.

**18.** Defendants provide the full text of the majority of press releases, SEC filings and news articles partially quoted by plaintiffs in the complaints.

**19.** Fed. R. Civ. P. 9(b).

were fraudulent." [20] Second, where an allegation regarding a misstatement or omission is made on information and belief, the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed." [21] Finally, bald allegations of *scienter* will not suffice. Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." [22] The precise application of these standards is at the heart of these motions.

### III. Section 10(b) and Rule 10b–5 Claims

In order to state a claim under Section 10(b) of the Exchange Act and Rule 10b–5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." [23] *Scienter* is "an intent to deceive, manipulate or defraud." [24]

### A. Particularity Requirement

■ Defendants argue that plaintiffs have failed to state the circumstances of the alleged fraud with the requisite particularity and have resorted instead to "puzzle pleading"—reproducing blocks of text from allegedly deceptive NTL statements without specifying which portions are misleading. [25] The Court disagrees. For the most part, the complaints specifically identify the date, publication and speaker [26] of each of the alleged misstatements or omissions. [27]

The particularity requirement demands also that plaintiffs sufficiently plead why the statements were fraudulent. [28] Plain-

20. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp,* Inc., 25 F.3d 1124, 1128 (2d Cir.1994)).

21. 15 U.S.C. § 78u–4(b)(1).

22. 15 U.S.C. § 78u–4(b)(2).

23. *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000); *see San Leandro Emergency Med. Group Profit Sharing Plan,* 75 F.3d at 808.

24. *Ganino,* 228 F.3d at 168.

25. Consolidated Mem. Law in Support of Defendants Motions to Dismiss ("Class Def. Mem.") 16–19.

26. Under the group pleading doctrine, plaintiffs may "rely on a presumption that statements in 'prospectuses, registration statements, annual reports, press releases, or other group-published information,' are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (quoting *In re Stratosphere Corp. Securities Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998)). This allows plaintiffs, to a limited extent, to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent" and remains available after enactment of the PSLRA. *In re KeySpan Corp. Sec. Litig.,* No. 01 CV 5852(ARR), 2003 WL 21981806, at *13 n. 3 (E.D.N.Y. July 30, 2003). Plaintiffs have alleged sufficiently that each individual defendant was an insider with direct involvement in the daily affairs of the company. Hence, for purposes of this motion, each individual defendant is responsible bears for statements in press releases, SEC filings and annual reports even where the statement at issue was made by another.

27. There are two exceptions where the Gordon Complaint fails the particularity requirement. First, it does not identify the publication of a statement by defendant Knapp in March 2000. Gordon Cpt. ¶ 63. Second, it fails to attribute one statement by Tamm, an NTL employee, to defendants. *Id.* ¶ 98.

28. The fact that these allegations refer back to earlier paragraphs of the complaint for factual support does not render them insufficient. Where the complaints fail to allege even this basic information, however, they fail the par-

tiffs attempt to do so by reciting detailed reasons after each alleged misstatement. For example, Class Plaintiffs claim that many statements were misleading because they failed to disclose that NTL was experiencing problems with integration of acquired companies, keeping churn rates low by under-reporting customer terminations, and maintaining non-paying subscribers on subscriber lists. They allege that other statements were misleading because defendants misrepresented that the integration of ConsumerCo was proceeding smoothly or that NTL was fully financed when in fact there were integration and working capital problems. The Gordon Plaintiffs, for their part, claim that statements were misleading because defendants misrepresented their ability to meet EBITDA projections and satisfy credit agreements. To the extent that the complaints contain facts supporting the existence and materiality of these problems, they satisfy the particularity requirement.[29] It is to this that the Court now turns.

## B. NTL's Alleged Problems

■ To support their claim that defendants' failure to disclose material problems made otherwise unobjectionable statements misleading, plaintiffs must allege an adequate basis for supposing that such problems actually existed. Where the allegations are premised upon information and belief, as is true of the majority,[30] the PSLRA requires that "the complaint ... state with particularity all facts upon which the belief is formed." [31] This standard is satisfied where plaintiffs "plead with particularity *sufficient* facts to support [the alleged] beliefs." [32] The type of facts and particularity required are determined on a case-by-case basis.[33]

Whether plaintiffs have pleaded with particularity sufficient facts to support their beliefs involves two separate inquiries. First, are the specific factual allegations that the problems existed based on adequate sources? In other words, have plaintiffs sufficiently identified the sources upon which their beliefs are based, and are these sources likely to have known the relevant facts? Second, do plaintiffs' factual allegations permit an inference that NTL was experiencing *material* problems during the relevant times? In other words, the facts alleged must support not only an inference that problems actually existed, but also an inference that the alleged problems would have been material to the reasonable investor.[34]

ticularity requirement. Gordon Cpt. ¶¶ 43, 89, 137; Class Cpt ¶¶ 138, 154, 164.

**29.** *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir.2001); *In re NBTY, Inc. Sec. Litig.*, 224 F.Supp.2d 482, 491–94 (E.D.N.Y.2002) (complaint failed to plead why statements were misleading where there was an insufficient basis to support allegations that adverse trends existed during the class period).

**30.** The Class Complaint is premised entirely upon information and belief. Class Def. Mem. 22; *see* Class Cpt. preamble. While parts of the Gordon Complaint are based on Gordon's personal knowledge, the majority is based on information and belief. *See, e.g.,* Gordon Cpt. ¶¶ 50, 98.

**31.** 15 U.S.C. § 78u–4(b)(1).

**32.** *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.2000). Plaintiffs argue that they are not subject to the PSLRA's pleading requirement for information and belief, as their complaint is based on an investigation of counsel. Plaintiffs Memorandum of Law in Opposition to Motion to Dismiss ("Class Pl. Mem.") 11. This is incorrect. *See Rothman* 220 F.3d at 89–90; *Novak,* 216 F.3d at 312.

**33.** *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 358 (S.D.N.Y.2003).

**34.** A misstatement or omission is material if it would have been considered significant by a reasonable investor in making investment decisions. *Basic Inc., v. Levinson,* 485 U.S. 224,

### 1. Integration Problems

The first category of alleged problems concerns NTL's ability to integrate its acquired companies, in particular its largest acquisition, ConsumerCo. Class Plaintiffs allege that NTL was experiencing significant difficulties in this regard based on the following subsidiary assertions: (1) employees at NTL and ConsumerCo refused to speak to one another, (2) NTL's customer service unit was unable to handle the expanded customer base, (3) NTL's billing systems were duplicative and uncoordinated following the acquisitions, and (4) Knapp admitted that NTL was having integration problems at an October 2000 meeting.[35]

■ The initial inquiry is whether these subsidiary factual allegations are premised upon adequate sources. Where plaintiffs rely on personal sources alone to support their allegations, as they do here, they need only describe the sources "with sufficient particularity to support the probability" that someone in the informant's position would possess the information alleged.[36]

■ Here, plaintiffs rely on former sales and marketing employees for the integration problem allegations, identifying each source by name or position at the company during the Class Period. Because it is likely that these sales and marketing employees would have been knowledgeable about customer service and integration problems, the allegations are adequately sourced.

The question whether plaintiffs are justified by these subsidiary allegations in drawing the conclusion that the company was experiencing integration problems of such significance that they would have been important to a reasonable investor is another matter. The complaint, apart from largely rhetorical flourishes of indeterminate meaning,[37] contains little or no hard information concerning the extent or prevalence of the subsidiary "facts" relied upon. Claims of "frequent" failures to complete service appointments,[38] for example, are meaningless unless one knows what "frequent" means. Indeed, the only quantitative information regarding the impact of problems with customer service is reference to an NTL survey, the date of which is not given, that allegedly found an average on-hold time of 25 minutes and that over 35 percent of callers disconnected before reaching a customer service representative.[39] But the complaint contains no information that would permit determination of the significance of these two facts. There is no indication of the period over which the reported average hold time and disconnect rates were observed—an

---

231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). This depends upon whether a reasonable investor would have an accurate and complete disclosure as altering the "total mix of information." *Id.* at 231–32, 108 S.Ct. 978.

35. Class Cpt. ¶¶ 42–46, 58.

36. *Novak,* 216 F.3d at 314.

37. For example, Class Plaintiffs, on the basis of a statement attributed to a manager named Bailey, allege that employees from NTL and ConsumerCo "refused to speak to each other." Class Cpt. ¶ 45. This statement, read literally, might be read as meaning that no one from either company ever spoke to anyone at the other, which is inconceivable. It could be construed also, with equal fidelity to the words, as meaning that one or two employees at NTL would not speak to one or two at ConsumerCo, which probably would be meaningless. The only logical way to read it is as an assertion by Bailey that there was an indeterminate amount of ill will among some of the employees at the respective companies and that this impaired communication to an indeterminate degree.

38. *Id.* ¶ 42(b).

39. *Id.* ¶¶ 42–43.

extremely busy night or weekend would be a matter of far less significance than a problem that persisted over weeks or months. Nor is any indication of what is normal in the operation of customer service call-in facilities. In the main, therefore, the Class Complaint fails adequately to allege facts that support their assertion, on information and belief, that substantial problems existed in integrating NTL's acquisitions.

There is one exception. The complaint asserts, on the basis of an allegedly first hand report, that defendant Knapp told an October 2000 meeting of NTL managers that the company had accumulated excessive debt and was having difficulty integrating the acquired companies. He is quoted as having said that NTL was "in trouble . . . [and] have got to cut back" and as having instructed those present to keep the briefing confidential.[40] The Court therefore is persuaded that the complaint alleges enough to justify the conclusion that the company was experiencing material integration problems as early as October 2000.

### 2. Subscriber Base Problems

■ Plaintiffs allege a second major problem that NTL failed to disclose: its use of unfair or fraudulent practices that artificially inflated the company's subscriber base. According to the Class Complaint, NTL hyped its reported subscriber numbers by (1) refusing to allow customers to terminate accounts, (2) acquiring new customers by offering free installation or services and then billing for them nonetheless, (3) recruiting customers in low income areas and weakening credit requirements, and (4) including non-paying customers, such as those with free Internet service, on subscriber rolls.[41] According to a senior marketing executive said to be knowledgeable on the subject, NTL recorded "as many as 75,000 more subscribers than it actually had" during the Class Period.[42]

Here, the factual allegations supporting plaintiffs' belief come from statements of former sales employees and former customers. The Class Complaint adequately describes these sources by their names or positions at the company, and it is likely that individuals in such positions would have access to the information reported.

The majority of the factual allegations permit an inference that NTL engaged in inappropriate behavior to inflate subscriber numbers.[43] For example, refusing to allow customers to terminate their accounts and including non-paying subscribers on subscriber rolls, if that occurred, would have portrayed NTL as having more paying subscribers than it actually had.

The Class Plaintiffs are justified also in asserting that the failure to disclose this information was material. The extent of the overstatement of the customer base in these circumstances, which the complaint does not make clear, is not alone dispositive of the materiality issue. The dishonesty inherent in manipulating customers to inflate reported results has independent

40. *Id.* ¶ 58.

41. *Id.* ¶¶ 48–57.

42. *Id.* ¶ 48.

43. While the majority of allegations permit such an inference, the allegations that NTL employees were targeting low income customers and offering free trial services do not.

The Class Complaint fails to allege that either of these practices was uncommon in the services industry or different from NTL's usual sales tactics. *Cf. In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 73 (aggressive sales tactics during Class Period support factual allegation of company's decreasing profitability).

significance because it reflects on the integrity of management.[44]

### 3. Negative Cash–Flow of ConsumerCo

█ The Gordon Complaint alleges that two statements not sued upon in the Class Complaint were misleading because, *inter alia*, defendants failed to disclose that ConsumerCo had become cash-flow negative by the time of the acquisition and was a deteriorating asset.[45]

The basis for this allegation is a statement allegedly made by defendant Knapp directly to plaintiff Gordon.[46] The allegation therefore is adequately sourced.

It cannot be said on a motion to dismiss that the cash flow status of ConsumerCo would not have been material to a reasonable investor in May 2000. Hence, plaintiffs have pleaded sufficiently that NTL's failure to disclose the cash flow status of its largest acquisition was a material omission.

### 4. Other Alleged Problems

█ The complaints allege a number of statements that allegedly were misleading for reasons that do not fit so neatly into the preceding categories. But these claims are not pleaded with the requisite particularity. All are examples of attempts to plead fraud by hindsight or are purely conclusory.

### a. Fraud by Hindsight

Plaintiffs argue that several statements were misleading because defendants failed to disclose that, *inter alia*, (1) work force reductions were not occurring as promised,[47] (2) NTL would not be able to meet EBITDA, revenue or additional subscriber projections without the use of fraudulent practices,[48] (3) NTL's compliance with its loan covenants was dependent upon its deceptive customer practices,[49] and (4) Cablecom, an asset Knapp indicated the company wished to sell in 2001, had no equity.[50]

Neither complaint alleges sufficient facts to support the assertions that material problems existed in most of these respects at the times the statements complained of were made. For example, the Gordon Complaint alleges that NTL could not meet its EBITDA, revenue or subscriber projections based solely upon the fact that NTL never met any of these projections. This is nothing more than an effort to allege fraud by hindsight.[51] We have not

---

**44.** *See Ganino*, 228 F.3d at 162; 2 Louis Loss & Joel Seligman, Securities Regulation 677 (3d ed.1999); *but see Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir.1995) (deficiencies found in previous inspections immaterial where affected only 1 percent of global company).

**45.** Gordon Cpt. ¶¶ 46–47, 52.

**46.** *Id.* ¶ 115.

**47.** *E.g.*, Gordon Cpt. ¶¶ 105, 119, 124. As defendants point out, NTL reduced its workforce by approximately 4,680 jobs between 2000 and 2001. Gordon Reply Mem. 5–6. That workforce reductions did not reach initial projections and that NTL reclassified some employees instead of firing them do not render the projections themselves misleading.

**48.** Gordon Cpt. ¶¶ 45, 66, 74, 78, 90, 91, 118, 122, 123, 131, 134, 136; Class Cpt. ¶¶ 122–23.

**49.** Gordon Cpt. ¶¶ 103–04.

**50.** *Id.* ¶¶ 105, 112, 114, 123.

**51.** *See Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865(HB), 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998)("Such allegations of fraud by hindsight are not actionable under the securities law.").

yet come to the point that a lack of clair-voyance constitutes fraud.[52]

### b. Insufficient Factual Support

In some instances, the complaints argue that statements were misleading by assert-ing, without support, that the opposite of the statement was true. For example, they allege that (1) statements attributed to Knapp in two August 10, 2000, *Bloomberg* articles were misleading because he reportedly stated that NTL was "fully fi-nanced" when in fact it was not,[53] (2) NTL's November 2000 workforce reduc-tion was motivated by the company's need to service its debt obligations and not the desire to eliminate duplications, as the company explained,[54] (3) NTL's former chief operating officer, Leigh Wood, left the company because management had lost confidence in her abilities and not because of marital difficulties, as Blumen-thal told Gordon in May 2000,[55] and (4) the acquisition of ConsumerCo did not im-prove NTL's operating results, as it claimed in its 2000 annual report.[56]

There is no factual support for any of these allegations in the complaints. A "conclusory allegation that the opposite of a statement ... is true, without further factual elaboration, is insufficient."[57]

### 5. Duty to Disclose

Even if material integration and sub-scriber base problems existed, defendants argue, they cannot form the basis for a securities fraud claim. These, they con-tend, reflected only corporate mismanage-ment, the existence of which is not subject to a duty to disclose.[58]

■ Defendants correctly assert that *Santa Fe Industries, Inc. v. Green*[59] and its progeny hold that allegations of garden-variety corporate mismanagement are not actionable under the federal securities laws. Plaintiffs, in other words, may not bootstrap state-law fiduciary duty claims into securities law claims.[60] Nevertheless, once a corporation speaks on a subject, it must speak truthfully and completely.[61] Hence, a failure to disclose facts that amount to mismanagement may render other statements misleading. Where the failure to disclose these facts involves an element of deception or manipulation, a federal securities law claim may lie.[62]

The essence of plaintiffs' claims here, to the extent they involve corporate misman-agement, is that the failure to disclose NTL's internal problems rendered state-ments that NTL did make misleading. Thus, they do not rely on mismanagement *per se* but on alleged deception. Defen-dants' argument therefore lacks merit.

### C. Scienter

#### 1. Pleading Requirements

Plaintiffs must "state with particularity facts giving rise to a strong inference that

---

**52.** *Acito,* 47 F.3d at 53 ("[D]efendants' lack of clairvoyance simply does not constitute secu-rities fraud.").

**53.** Class Cpt. ¶¶ 78–79, 80–81.

**54.** *Id.* ¶¶ 94–95, 96–98.

**55.** Gordon Cpt. ¶ 121.

**56.** *Id.* ¶ 83.

**57.** *In re Health Mgmt. Sys., Inc. Sec. Litig.,* 1998 WL 283286, at *5.

**58.** Class Def. Mem. 27–28.

**59.** 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

**60.** *E.g., Field v. Trump,* 850 F.2d 938 (2d Cir.1988).

**61.** *In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d at 380.

**62.** *See Suez Equity Investors v. Toronto–Do-minion Bank,* 250 F.3d 87, 99 (2d Cir.2001).

the defendant acted with the requisite state of mind." [63] This may be done "either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." [64]

### a. Motive and Opportunity

■ In alleging motive and opportunity, plaintiffs must demonstrate the presence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" as well as "the means and likely prospect of achieving concrete benefits by the means alleged." [65] But "[g]eneral allegations that the defendants acted in their economic self-interest are not enough." [66] Nor are allegations of motives "generally possessed by most corporate directors and officers." [67] Accordingly, the Second Circuit has found insufficient as motives capable of grounding a fraud allegation desires such as (1) maintaining a bond or credit rating,[68] (2) prolonging executive compensation,[69] (3) increasing executive compensa-

tion by inflating the value of a stock,[70] and (4) making the issuer appear profitable.[71]

### b. Conscious Misbehavior and Recklessness

■ The other permissible basis for the requisite allegation of *scienter* is facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Conscious misbehavior encompasses deliberately illegal conduct.[72] Recklessness, on the other hand, is conduct that is highly unreasonable and "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." [73] Allegations of defendants' knowledge of facts or access to contradictory information usually are sufficient to state a claim based on recklessness.[74] It is well established, however, that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." [75] Whether a complaint has "specifically identified" a report or statement is highly fact specific and should be determined in light of the complaint as a whole.[76]

---

63. 15 U.S.C. § 78u–4(b)(2).

64. *Acito,* 47 F.3d at 52; *see also Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); *Ganino,* 228 F.3d at 169–70; *Rothman,* 220 F.3d at 90.

65. *Shields,* 25 F.3d at 1130; *see also Novak,* 216 F.3d at 307.

66. *Ganino,* 228 F.3d at 170.

67. *Kalnit,* 264 F.3d at 139.

68. *San Leandro Emergency Med. Group Profit Sharing Plan,* 75 F.3d at 814.

69. *Shields,* 25 F.3d at 1130.

70. *Acito,* 47 F.3d at 54.

71. *Chill v. Gen. Electric Co.,* 101 F.3d 263, 268 (2d Cir.1996).

72. *Novak,* 216 F.3d at 308.

73. *Id.* (quoting *Honeyman v. Hoyt (In re Carter–Wallace, Inc. Sec. Litig.),* 220 F.3d 36, 39 (2d Cir.2000) (citation omitted)).

74. *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 76.

75. *Novak,* 216 F.3d at 309.

76. *See, e.g. Rothman,* 220 F.3d at 94; *In re Oxford Health Plans, Inc.,* 187 F.R.D. at 139. Where the information is exclusively within the opposing party's knowledge, pleading requirements are somewhat relaxed. *See Schlick,* 507 F.2d at 379 ("the rule relating to

## 2. NTL

### a. Class Complaint

■ The Class Complaint is replete with allegations that NTL knew of or recklessly disregarded the existence of the integration and subscriber base problems.[77] As for knowledge of the integration problems, the complaint bases its allegations of *scienter* on internal reports [78] and studies [79] and the alleged statement by Knapp at the October 2000 meeting.[80] There is no need to determine whether the complaint has specifically identified the internal reports and studies, as the allegation that defendant Knapp admitted that NTL was experiencing integration problems in the October 2000 meeting is sufficient to justify an inference of fraudulent intent for pleading purposes based on a theory of conscious misbehavior or recklessness.

The allegations of NTL's knowledge or reckless disregard of subscriber base problems also are sufficient. Plaintiffs argue that NTL management was aware of the alleged deceptive practices to increase artificially the subscriber numbers.[81] While the complaint fails to describe who exactly it considers to have been in NTL management, the allegations permit the inference that some members of NTL's upper echelon, such as Scott Faulkner, the managing director of NTL's consumer business unit, were aware of the practices of refusing to allow NTL customers to terminate their accounts as well as the impact of such practices on the chum rate. Moreover, while the complaint does not allege exactly who directed sales representatives to sign up customers, knowing they would be unable to pay bills, it permits the inference that some level of management directed this practice.

information and belief may be relaxed as to matters peculiarly within the opposing party's knowledge"). It is unclear, however, exactly what plaintiffs must allege in order to identify specifically reports showing that defendants had access to contradictory information. *Compare In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76 (adequate pleading of *scienter* where complaint detailed what defendants knew on a daily, weekly and monthly basis); *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 631–32 (S.D.N.Y.2003) (pleading sufficient where plaintiffs identified budgets received by defendants showing 20 percent lower purchases for the coming year); *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *7 (S.D.N.Y. March 27, 2001) (inference of fraudulent intent where complaint alleged weekly reports to defendants detailing deteriorating inventory situation); *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 139 (sufficient pleading of *scienter* where complaint identified report by date, author and substance); *with San Leandro Emergency Med. Group Profit Sharing Plan*, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales

is insufficient to survive a motion to dismiss."); *Vogel v. Sands Bros. & Co.*, 126 F.Supp.2d 730, 743 (S.D.N.Y.2001) (insufficient pleading of *scienter* where plaintiffs failed to identify any reports providing defendants with contradictory information).

**77.** *See, e.g.*, Class Cpt. ¶¶ 59 ("NTL staff continuously informed upper management of NTL's stagnant or declining subscriber base and chronic customer retention problems through direct communications, meetings and in regularly-prepared reports"), 60 ("John Harrison and others from NTL's Consumer Finance and Financial Groups reported revenue decline on a monthly basis to Faulkner. Faulkner forwarded that information to Defendants."), 61 ("Defendant Blumenthal made frequent telephone calls from the United States to NTL").

**78.** Class Cpt. ¶ 60.

**79.** *Id.* ¶ 175.

**80.** *Id.* ¶ 58.

**81.** *Id.* ¶¶ 51, 55, 56.

### b. Gordon Complaint

The Gordon Complaint alleges that NTL failed to disclose that its largest acquisition, ConsumerCo, had become cash-flow negative by the transaction's closing. Plaintiffs specifically identify the statement allegedly demonstrating NTL's knowledge of this fact, as defendant Knapp allegedly admitted as much to plaintiff Gordon in a September 2001 conversation.[82] Defendants correctly argue that the statement only addresses what they knew in September 2001 and not at the time of the alleged misstatements in May 2000. Even so, it seems unlikely that NTL would not have known the financial status of its acquisition when the transaction concluded. This certainly permits, at this stage, a strong inference of fraudulent intent.

### 3. Individual Defendants

■ Plaintiffs argue that the complaints provide adequate support for their allegations of fraudulent intent on the part of the individual defendants by alleging facts showing both motive and opportunity and recklessness.

### a. Motive and Opportunity

### (i) Class Complaint

The Class Complaint alleges that the individual defendants were motivated to commit securities fraud (i) to maintain access to capital markets, (ii) to abide by credit agreements, and (iii) to protect their compensation, which was heavily dependent on the success of the integration efforts.[83] The first two allegations are insufficient for the reasons discussed above. The Second Circuit has found the third alleged motive to be equally insufficient, as "incentive compensation can hardly be the basis on which an allegation of fraud is predicated." [84] Class Plaintiffs therefore have failed to allege the concrete and personal benefit required to properly allege motive.

### (ii) Gordon Complaint

The Gordon Plaintiffs assert an additional motive on the parts of defendants Knapp, Blumenthal and Gregg, arguing that an inflated stock price allowed the individual defendants to engage in insider trading, especially the receipt and exercise of stock options by the individual defendants.[85] But the allegation that the individual defendants received or exercised stock options is insufficient in a case like this. There simply is no reason to infer fraud from the acquisition of shares by insiders where the thrust of the alleged fraud is the concealment of bad news, as such share acquisitions would be contrary to the insiders' self interest.[86]

---

**82.** Gordon Cpt. ¶ 115.

**83.** Class Pl. Mem. 19–20.

**84.** Acito, 47 F.3d at 54 (quoting Ferber v. Travelers Corp., 785 F.Supp. 1101, 1107 (D.Conn.1991)); see Shields, 25 F.3d at 1130 ("[t]o allege a motive sufficient to support the inference that optimistic but erroneous statements were fraudulently made, a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.").

**85.** Gordon Pl. Mem. 17–18.

**86.** The Gordon Complaint alleges that Knapp exercised options for a gain of $3.9 million in 2000. Gordon Cpt. ¶ 87. The use of such language is consistent with two possibilities: (1) Knapp exercised options to buy at prices aggregating $3.9 million below the market as of the time of exercise, and (2) he exercised options to buy and then sold the shares thus acquired for a gain of $3.9 million. The first possibility could not justify an inference of fraud for the reason given in the text. The second, on the other hand, would be consistent with a desire to sell shares in advance of disclosure of bad news. The Gordon Complaint, however, alleges that both Blumenthal

The allegation that defendant Blumenthal sold 93,148 shares of NTL stock for $8.34 million in April 2000 [87] is appears more troublesome, but only marginally so. While allegations of insider trading may permit an inference of *scienter*, plaintiffs must allege also that the insider trades were unusual.[88] Relevant factors in determining whether insider trading activity is unusual include the amount of profit, the percentage of defendant's holdings that were sold, and the number of insiders who sold stock.[89] There is no *per se* rule, however, that sale of a particular monetary amount or percentage of total holdings is unusual.[90]

The complaint alleges that Blumenthal received options to purchase 7.25 million shares on May 30, 2000 alone, valued by NTL at up to $735 million.[91] Apart from the April 2000 sale, there no allegation that Blumenthal or any other individual defendant sold stock at any other time during the Applicable Period.[92] In this context, Blumenthal's sale of 93,148 shares in April 2000 only weeks before exercising an option to buy 7.25 million shares in the following month is not suggestive of a desire to get rid of his holdings in advance of the disclosure of bad news. Accordingly, the allegation of Blumenthal's sale does not justify an inference of *scienter*.[93]

### b. Conscious Misbehavior or Recklessness

■ Plaintiffs argue that the individual defendants knew of or recklessly disregarded the existence of the integration problems, as well as the use of deceptive

---

and Knapp exercised options in 2000 for large gains and then carefully goes on to allege that Blumenthal sold shares on April 10, 2000. *Id.* It makes no such allegation as to Knapp. In consequence, the only reasonable reading of the pleading insofar as it concerns Knapp's options is that the Gordon Plaintiffs are not alleging that Knapp sold.

**87.** Gordon Cpt. ¶ 87. While plaintiffs refer to a sale of stock by Knapp in April 2000 in their opposition memorandum, there is no mention of such a sale in the Gordon Complaint. Gordon Pl. Mem. 42. Instead, it is clear that the Gordon Plaintiffs are referring to defendant Knapp's alleged gain of $3.9 million from the exercise of stock options in April 2000. Gordon Cpt. ¶ 87.

**88.** *In re Scholastic Corp. Litig.*, 252 F.3d at 74; *Rothman*, 220 F.3d at 94; *In re Interpublic Sec. Litig.*, 2003 WL 21250682, at *11.

**89.** *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74–75; *Rothman*, 220 F.3d at 94–95; *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir.1999); *Acito*, 47 F.3d at 54.

**90.** *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 75.

**91.** *Id.*

**92.** The Gordon Plaintiffs mention a *New York Times* article that reported that defendant Blumenthal had sold an additional $30 million worth of stock during the Applicable Period and that other NTL directors not parties to this action sold NTL shares as well. Gordon Pl. Mem. 18 and n. 9. The only mention of the *New York Times* article in the complaint is that it ran on August 25, 2002, and reported that "several of [NTL] directors together sold tens of millions of dollars of NTL stock." *Id.* ¶ 20. The Gordon Complaint fails sufficiently to identify this article. Regardless, the information in the article does not support an inference of unusual trading. Two of the other directors who engaged in trading sold 10 percent or less of their total holdings. *Id.* There is no information as to when defendant Blumenthal allegedly sold $30 million of NTL shares or what proportion this represented of his total holdings.

**93.** *See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan*, 75 F.3d at 814 ("In the context of this case, we conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent."); *Acito*, 47 F.3d at 54 (sale of stock by one outside director insufficient to give rise to strong inference of intent to deceive investing public).

practices to inflate the perceived size of the subscriber base. The Gordon Plaintiffs claim also that the individual defendants knew of ConsumerCo's negative cash-flow in May 2000. The basic allegations are the same as those discussed above for NTL. The additional inquiry here is whether the facts alleged lead to an inference of *scienter* on the part of each of the individual defendants.

### (i) Integration Problems

Defendant Knapp's statement concerning integration problems at the October 2000 management meeting is clear support for the proposition that he had access to facts contradicting his public statements. While there is no allegation that the other individual defendants were present at this meeting, nearly one hundred top managers of NTL allegedly attended. This permits the inference that the other individual defendants, all of whom were involved in the daily management of the company, would have learned of information presented at such a large meeting even if they did not attend.[94]

### (ii) Subscriber Base Problems

Whether each individual defendant knew or recklessly disregarded information about the alleged fraudulent practices inflating the subscriber numbers is less clear. There is no support for the allega-

tions that any individual defendant knew of or recklessly disregarded the deceptive practices used by some employees to inflate artificially the subscriber numbers. For example, while the complaint alleges that Knapp and Blumenthal were telephoned to discuss the practice of refusing to allow customers to terminate accounts, defendants correctly point out that the Class Complaint does not allege that they were reached or what they were told.

The complaints permit the inference, however, that defendants Knapp and Blumenthal knew from internal reports that the number of paying subscribers was declining and, thus, that any reported figures during this time were misleading. For the most part, the Class Complaint has provided general information as to the substance, frequency and authors of the internal reports. For example, the complaint alleges that sales and marketing employees "informed upper management of NTL's stagnant or declining subscriber base and chronic customer retention problems through direct communications, meetings, and in-regularly-prepared reports forwarded to Defendants Knapp and Blumenthal."[95] Accordingly, the allegations permit the inference that defendants Knapp and Blumenthal knew that the reported subscriber base was increasing only by including non-paying subscribers in the re-

---

94. Defendants argue that the Court cannot impute knowledge of facts contradicting NTL's public statements based solely on their status as officers and directors. Class Def. Reply Mem. 9. The Court agrees. The Class Complaint, however, alleges more than the individual defendants' status—it alleges that all individual defendants were involved in the daily operation of the company, that the president and chief executive officer knew there were integration problems, and that one hundred other top managers were told of the problems as well. Such allegations permit the inference that information shared with

one hundred top managers would have been shared with NTL's chief operating officer, chief financial officer and treasurer as well.

95. *Id.* ¶ 59. Many other allegations of *scienter* are insufficient. For example, the allegation that Blumenthal called NTL daily provides no indication of what he was told about any of the alleged problems. To the extent any allegations do not provide even a general nature of a report forwarded to NTL management (e.g., whether the numbers had declined), they are insufficient.

leased figures. Such allegations are sufficient to overcome a motion to dismiss.

The allegations of *scienter* for defendant Carter are sufficient as well. The Class Complaint refers to a conference call between NTL management and analysts in November 2001. After the call, the customer marketing director allegedly asked defendant Carter how he could reassure investors when he knew that NTL was not "going to be okay," to which defendant Carter allegedly responded, "[w]hat I tell [the analysts] is nine-tenths bullshit and one-tenth selected fact." [96] While this statement does not indicate what knowledge defendant Carter possessed about the alleged subscriber problems, it supports a strong inference that he did not believe what he told the analysts and that he was aware of some major internal problems. Thus, the Class Complaint sufficiently pleads *scienter* for defendant Carter as of November 2001. [97]

The allegations of *scienter* with respect to the claims based on failure to disclose subscriber base problems for defendant Gregg are insufficient, even under the most liberal interpretation of the Second Circuit's requirement that plaintiffs specifically identify reports containing contradictory information. The Class Complaint contains numerous allegations that reports were forwarded to Gregg. [98] Yet the Class Complaint fails to allege the content of these reports at even the most general level. [99] The Gordon Complaint does not contain any additional allegations that defendant Gregg knew or recklessly disregarded the subscriber base problems.

### (iii) Negative Cash–Flow of Consumer-Co

Finally, the Gordon Plaintiffs argue that the individual defendants knew that ConsumerCo had become cash-flow negative, but failed to disclose that fact in two May 2000 statements concerning the acquisition. The allegation of *scienter* is certainly sufficient for defendant Knapp, as he admitted his knowledge to Gordon in September 2001. But there simply is no basis for an inference of fraudulent intent on behalf of defendants Blumenthal or Gregg. Allegations that they should have known about ConsumerCo's financial state based solely on their executive positions are not enough to plead *scienter*. [100] Thus, the Gordon Plaintiffs have failed to plead a securities fraud claim with respect to Blumenthal's statement to Gordon in May

---

**96.** *Id.* ¶ 146.

**97.** As Carter is a defendant in No. 02 Civ. 3013 only, the *scienter* allegation as to him does not relate to No. 02 Civ. 7377.

**98.** *See, e.g.*, Class Cpt. ¶¶ 59 ("Faulkner, a managing director of NTL, personally met with representatives of NTL's various divisions, and forwarded their reports to management, including ... Gregg"); 146 ("Based upon monthly reports that quantified the total number of subscribers against those who were paying subscribers, Defendants knew that NTL's paying subscriber base was, in fact, shrinking.").

**99.** For example, an allegation that a managing director of NTL met with representatives

of various divisions and forwarded reports to defendants, including Gregg, says nothing about what type of information was contained in the report. *Id.* ¶ 59. Other allegations fail to address which department wrote the report and whether the report was even forwarded to defendant Gregg. *Id.* ¶ 146.

**100.** *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead *scienter*.") (listing cases).

2000.[101] The pleadings, however, are sufficient under the group pleading doctrine with respect to all three individual defendants for the May 2000 press release.[102]

### D. Alternate Grounds for Dismissal

Defendants argue that the majority of the alleged misleading statements are not actionable because they were statements of general optimism or were made by third parties.

#### 1. Optimistic Statements

Several of the remaining alleged misleading statements are optimistic projections or positive statements about the company's financial health. Defendants argue that these statements were mere puffery[103] or appropriately qualified forward-looking statements.[104]

#### a. Puffery

 Vague expressions of optimism, or puffery, are insufficient to support a claim for securities fraud.[105] Projections of future performance may be actionable under Section 10(b) if they are worded as guarantees or supported by specific facts or if the speaker does not reasonably believe them.[106] Corporate officials need not, however, present an overly gloomy picture of current performance and future prospects, as long as their statements are consistent with reasonably available data.[107]

 Defendants argue that several of the challenged statements were nothing more than vague expressions of optimism regarding operating results or NTL's future in general. For example, in August 2000, NTL issued a press release concerning its prior quarter's operating statistics in which Knapp reportedly stated, "[w]e are extremely proud of this quarter's operating performance.... The second quarter was the most successful in our history.... We believe tremendous opportunities await us." [108].

The Class Complaint allegations permit an inference that defendants had no reasonable basis for such positive statements by November 2001, but no earlier. It was at this time that NTL began reporting slowing revenue and subscriber growth and that defendant Carter allegedly admitted the company was misrepresenting existing facts to analysts.[109] That defendants allegedly had earlier knowledge of declining revenue or subscriber numbers does not mean that they had no adequate basis for releasing optimistic statements. Thus, to the extent plaintiffs have alleged misstatements based on optimistic statements prior to November 2001, the statements are not actionable.

---

101. Gordon Cpt. ¶ 52.

102. *Id.* ¶ 46.

103. Class Cpt. ¶¶ 69, 80, 94, 96, 106, 111, 124, 132, 144; Gordon Cpt. ¶¶ 52, 66.

104. Class Cpt. ¶¶ 69, 71, 75, 92, 94, 96, 100–01, 106, 111, 115, 122, 132, 144.

105. *Novak*, 216 F.3d at 315.

106. *In re International Business Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

107. *Novak*, 216 F.3d at 309.

108. Class Cpt. ¶ 69.

109. *See, e.g., In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *17 (optimistic statements not puffery where complaint permitted an inference defendants knew statements misrepresented existing facts); *In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208, 218 (D.Conn. 2001) (not puffery where plaintiffs allege defendants made optimistic statements "knowing they were contrary to the company's actual situation").

*b. Forward–Looking Statements*

█ Under the safe-harbor provision of the PSLRA, a statement concerning projections or future plans "generally does not give rise to a securities fraud claim if either: (1) it is accompanied by meaningful cautionary language, or (2) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading." [110] It applies "to forward-looking statements only and not to material omissions or misstatements of historical fact." [111] Both oral and written communications may qualify for protection.[112]

█ Forward looking statements include financial projections, descriptions of future plans or objectives of management, and discussions of future economic performance.[113] Here, defendants identify numerous statements as forward looking, including (1) expectations that the company would be "free cash flow positive" by the end of 2003,[114] (2) the company's plan to target additional subscribers,[115] and (3) projections of cost savings or future earnings.[116]

Plaintiffs argue that these statements do not fall under the safe-harbor provision because they are not accompanied by the requisite cautionary language or identified as forward looking. That statements are not accompanied by cautionary language or identified as forward looking does not end the analysis, however. Plaintiffs still must allege facts that permit the inference that defendants made the statements with actual knowledge of their falsity in order to remove forward-looking statements from the protection of the safe-harbor provision.

█ The allegations in the Class Complaint fail to permit such an inference before November 2001, when defendant Carter essentially admitted that he was misrepresenting existing facts to analysts. Hence, the majority of these statements are within the safe-harbor provision to the extent they are forward looking.[117] The one exception is defendant Knapp's statement on November 7, 2001, that NTL would turn free-cash flow positive by the end of 2003.[118] Plaintiffs have alleged sufficient facts supporting their claim that defendants knew at this time that any projections were based on a misrepresentation of existing facts. Hence, the statement does not merit the protection of the safe-harbor provision.[119]

110. *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d at 629; *see also* 15 U.S.C. § 78u–5(c).

111. *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 340 (S.D.N.Y.2001).

112. 15 U.S.C. § 78u–5(c).

113. 15 U.S.C. § 78u–5(i).

114. Class Cpt. ¶¶ 92, 106, 124, 144.

115. *Id.* ¶¶ 69, 75, 111.

116. *Id.* ¶¶ 100.

117. *See In re KeySpan Sec. Litig.*, 2003 WL 21981806, at *18. Those statements that contain both existing facts, such as financial reports, and forward-looking language are protected only for those portions that are forward-looking. *See In re Vivendi Universal Sec. Litig.*, 02 Civ. 5571(HB), 2003 WL 22489764, at *18 (S.D.N.Y. Nov. 3, 2003).

118. Class Cpt. ¶ 144.

119. That the statement was accompanied by cautionary language does not suffice to place it under the safe harbor provision's protection. The language itself was generic, warning that actual results may be "materially different" than the projections. This "does not come close to the cautionary language needed to render reliance on the misrepresentation unreasonable." *In re Vivendi Universal Sec. Litig.*, 2003 WL 22489764, at *18 (internal quotations omitted).

## 2. Statements by Securities Analysts

Defendants argue also that they should not be responsible for statements made by "third-party securities analysts" during the Class Period.[120]

 Corporate officials may face liability "for false and misleading information disseminated through analysts' reports by alleging that the officials either: (1) intentionally fostered a mistaken belief concerning a material fact that was incorporated into reports, or (2) adopted or placed their imprimatur on the reports." [121]

 Class Plaintiffs here argue that defendants intentionally fostered mistaken beliefs that later were incorporated into analysts' reports.[122] To impute analyst statements to defendants, the Class Complaint must allege that analysts relied on specific information provided to them by defendants.[123] By this standard, the complaint is clearly insufficient. While the complaint refers to some conference calls between defendants and analysts, it does not identify the exact statements allegedly made by defendants, nor allege that these statements ever reached the public.[124] Instead, it appears that plaintiffs are trying to hold defendants responsible for a different group of analyst statements—those issued in response to defendants' public statements.[125] To the extent defendants made misleading statements to the public, they are already subject to liability. That analysts absorbed these statements does not establish an independent basis of liability.

## IV. Section 20(a) Claim—Control Person Liability

Plaintiffs claim that each of the individual defendants is liable as a controlling person under Section 20(a) of the Exchange Act, which provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and

120. Class Def. Mem. 40–41. Defendants have not made this argument with respect to any allegedly misleading statements in the Gordon Complaint. Thus, this section deals with the Class Complaint only.

121. *Novak*, 216 F.3d at 314 (quoting *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163–64 (2d Cir.1980))(internal quotations omitted).

122. Class Pl. Mem. 28–29. While the Class Complaint contains numerous statements by analysts, plaintiffs only allege that two of these were false and misleading. *See* Class Cpt. ¶¶ 90, 126. The remainder are included in the Class Complaint to illustrate that analysts were absorbing the positive information released by defendants. Class Pl. Mem. 29.

123. *See, e.g., Novak*, 216 F.3d at 314 (statements made by securities analysts were properly attributed to defendants for pleading purposes where plaintiffs identified the exact statements defendants made to analysts and on what date, as well as provided an example of how analysts released such information to the public); *In re Revlon, Inc. Sec. Litig.*, 2001 WL 293820, at *9 (denying motion to dismiss with regard to misrepresentation to analyst where senior company executives made statements directly to analysts).

124. The one exception is a July 26, 2001 conference call with analysts where the Class Complaint alleges defendant Knapp "tried to assuage concerns that the Company was carrying an unsustainable debt burden." Class Cpt. ¶ 130. There is no allegation, however, that such assurances reached the public.

125. For example, the Class Complaint alleges that based upon defendants public statements, "Chase Hambrecht & Quist Inc. issued an analyst report in which it initiated coverage of NTL with a "Buy" rating . . . . The report praised NTL's "growth rates" and the supposed expansion of its customer base through the signing up of customers for free Internet and digital cable service." *Id.* ¶ 90. The Class Complaint claims defendants should be responsible for the statements in the CH & Q report because such statements were misleading. *Id.* ¶ 91.

severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.*"[126]

The parties agree that the elements of Section 20(a) liability include both a primary violation and the defendant's control over the primary violator. The part company on the question remains whether plaintiffs must allege also culpable participation by the control person.

This is an interesting question on which courts, both within and outside this circuit, are deeply divided.[127] As the Court has concluded, in light of the group pleading doctrine, that the complaints state legally sufficient claims for relief against the individual defendants as primary violators, there is no present need to reach this question. Hence, the motion to dismiss the Section 20(a) claims is denied without prejudice. Defendants may raise the point anew if plaintiffs fail to establish a primary violation by any of the individual defendants at trial.

## V. Additional Claims by Gordon Plaintiffs

The Gordon Complaint asserts two causes of action that are not included in the Class Complaint. First, the Gordon Plaintiffs argue that NTL and the individual defendants violated 17 C.F.R. § 229.303 by failing to report to the SEC alleged negative trends with Consumer-Co's subscriber base. They make common law fraud claims against all defendants as well.

### A. 17 C.F.R. § 229.303

The Gordon Plaintiffs assert a claim against NTL and the individual defendants for failure to comply with the reporting requirements governing SEC Form 10–Q. Item 303 of SEC Regulation S–K requires management to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."[128]

 While a violation of Item 303, in some circumstances, may give rise to a claim under Section 10(b) of the Exchange Act, there is no private cause of action for violation of Regulation S–K.[129] Thus, Gor-

---

126. 15 U.S.C. § 78t(a) (emphasis added).

127. *Compare Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir.1992); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985), *cert. denied sub nom, Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 n. 24 (9th Cir. 1990); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996); *In re IPO.*, 241 F.Supp.2d at 392–97; *In re Interpublic Sec. Litig.*, 2003 WL 21250682, at *15; *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 21219049, at *18–20 (S.D.N.Y. May 19, 2003); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284 (S.D.N.Y.1994); *with Rochez Bros. v. Rhoades*, 527 F.2d 880, 890–91 (3d Cir.1975); *Carpenter v. Harris, Upham & Co.*, 594 F.2d

388, 394 (4th Cir.1979); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748(SHS), 2003 WL 22953163, at *12 (S.D.N.Y. Dec. 15, 2003); *In re Oxford Health Plans, Inc.* 187 F.R.D. at 142; *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d at 222.

128. 17 C.F.R. § 229.303(a)(3)(ii).

129. *In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 293 (S.D.N.Y.1999); *see also Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000); *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 402–03 (6th Cir.1997); *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 49 (D.Mass.1998). Gordon Plaintiffs do not assert otherwise, as they did not address the cause of action under 17 C.F.R. § 229.303 in their opposition papers.

**38**

don Plaintiffs' claim for alleged violation of 17 C.F.R. § 229.303 is dismissed.

### B. Common Law Fraud Claims

The Gordon Complaint states also claims for common law fraud against all defendants. To the extent that the Court has not dismissed the federal claims and defendants challenge on jurisdictional grounds only, defendants' motion to dismiss the state law claims is denied.

### VI Conclusion

For the foregoing reasons, the motion of the individual defendants to dismiss the Class Complaint and the motion of defendants to dismiss the Gordon Complaint are disposed of as follows:

(a) The motions are granted insofar as they complain of

(i) the statements alleged in Class Cpt. ¶¶ 78, 82, 90, 94, 111, 118, 126–28, 130, 135, 138, 150–52, 154, 164 and Gordon Cpt. ¶¶ 43, 45, 63, 74, 78, 83, 89, 98, 103, 105, 112, 114, 118–19, 121, 122, 124, 137,

(ii) the forward looking statements and general expressions of optimism alleged in Class Cpt. ¶¶ 69, 71, 75, 80, 92, 100–01, 106, 109, 115, 122, 124, 132, 134 and Gordon Cpt. ¶¶ 52, 64, 66, 76, 80, 82, 96, 100, 102, and

(iii) alleged violation of 17 C.F.R. § 229.303.

(b) The motions are denied in all other respects.

SO ORDERED.